## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GILBERT THOMAS GREENFIELD, JR.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**JON CORZINE, et al.,**<br><br>**Defendants.** | **Civil Action No.: 2:09-4983**<br><br>**REPORT AND RECOMMENDATION** |

This matter comes before the Court upon the motions of the defendants to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

After considering the submissions of the parties, and based on the following, the Court respectfully recommends that the District Court grant in part and deny in part the defendants' motions.

## I.      BACKGROUND

### 1.      Procedural History

Plaintiff is a civilly committed individual currently confined at the Special Treatment Unit ("STU") in Kearny, New Jersey pursuant to the New Jersey Sexually Violent Predator Act (the "SVPA") (N.J.S.A. 30:4-27:24, *et seq.*).   On September 28, 2009, Gilbert Greenfield ("Plaintiff") filed a complaint for damages and declaratory and injunctive relief under 42 U.S.C. § 1983 against defendants Jon Corzine ("Corzine"), former Governor of New Jersey; Ann Milgram ("Milgram"), former Attorney General of the State of New Jersey; George Hayman ("Hayman"), Commissioner of the New Jersey Department of Corrections ("NJDOC"); Grace

Rogers ("Rogers"), former Superintendent of the Adult Diagnostic & Treatment Center ("ADTC"), which oversees the operations of the Special Treatment Unit ("STU") where plaintiff is committed; Jennifer Velez ("Velez"), Commissioner of the New Jersey Department of Human Services (NJDHS); John Main, Director of the Ann Klein Forensic Center; Merrill Main, Ph.D., Clinical Program Director for the STU; Paul Lagana ("Lagana"), former Assistant Superintendent of ADTC; Cindy Sweeney ("Sweeney"), former Assistant Superintendent of ADTC; Natalie Barone ("Barone"), Administrator Psychology Services; Bernard Goodwin ("Goodwin"), Administrator of the ADTC; Shantay Brain Adams ("Adams"), Unit Director at STU Kearny facility; Tina Silletti-Spagnuolo ("Silletti-Spagnuolo"), Unit Director at the STU-Annex; Jacquelyn Ottino ("Ottino"), Program Coordinator Team III; Robert Carlson ("Carlson"), Clinical Psychologist I; Brian Friedman ("Friedman"), Ph.D., Clinical Psychologist II; Nicole Paolillo ("Paolillo"), Clinical Psychologist III; Tesa Kearney Simms ("Simms"), Supervisor of Recreation; Terri Roth ("Roth"), Supervising Rehabilitation Counselor; Louis Norton ("Norton"), Supervising Rehabilitation Counselor; James Whalen ("Whalen"), Substance Abuse Counselor; Tyrone Toliver ("Toliver"), Substance Abuse Counselor; John and Jane Does (1-50), responsible for the facilitating of process groups and psycho-educational modules, as well as generating reports and evaluations for the inmate involved; John and Jane Does (51-80), responsible for the administration of policies and practices, staff safety, and the orderly running of the wings and institution; John and Jane Does (81-100).

Plaintiff asserted claims for continued confinement in violation of his right against double jeopardy, application of ex post facto laws, and Due Process Clauses of the Eighth and Fourteenth Amendments; denial of access to the Courts in violation of the First, Sixth, and Fourteenth Amendments; denial of free religious exercise in violation of the First and Fourteenth

2

Amendments; abuse of authority in violation of the Fifth, Eighth, and Fourteenth Amendments; denial of education and vocational treatment in violation of the Fifth, Eighth, and Fourteenth Amendments; failure to provide adequate treatment in violation of the Fifth, Eighth, and Fourteenth Amendments and Title 30:4-127.11b of New Jersey State Law; and denial of equal protection.

On May 6, 2010, the District Court dismissed with prejudice Plaintiff's claim for continued confinement and denial of free religious exercise, and dismissed without prejudice Plaintiff's claim for denial of access to the Courts. (5/6/10 Opinion 17-28, ECF No. 3). The District Court allowed Plaintiff's remaining claims to proceed, and additionally noted that, while not specifically pled, Plaintiff appeared to have alleged a retaliation claim against the defendants. *Id.* at 28-29. In particular, the court observed that "it appears that many of the allegations can be construed as retaliatory conduct by defendants against Greenfield for expressing his First Amendment right to free speech" by complaining to the press about the conditions at the Special Treatment Unit ("STU") in Kearny, New Jersey, where Plaintiff is currently confined. *Id.* at 29-30.

On October 22, 2010, in lieu of an answer, defendants Corzine and Milgram and defendants Velez, John Main, Merrill Main, Adams, Silletti-Spagnuolo, Ottino, Carlson, Paolillo, Roth, Norton, Whalen, Toliver and Sims (collectively, the "DHS Defendants") filed a motion to dismiss Plaintiff's Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. On October 23, 2010 defendants Hayman, Rogers, Lagana, Sweeney and Goodwin (collectively, the "DOC Defendants") filed a separate motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.

3

On November 8, 2010, with the Court's permission, Plaintiff filed a Supplemental Complaint. The Supplemental Complaint included all of the allegations and claims asserted in Plaintiff's original Complaint, and added claims for retaliation; violation of due process under the Fifth, Sixth and Fourteenth Amendments, and deliberate indifference in violation of the Eighth and Fourteenth Amendments. Plaintiff's Supplemental Complaint additionally added allegations relating to his original claim for violation of equal protection and his new claim for retaliation.

### 2.   Factual History

#### a. Plaintiff's Allegations

Plaintiff is currently confined at the STU as a civilly committed sexually violent predator ("SVP") under the SVPA. Plaintiff was scheduled to be released on parole, but Defendant Rogers, former Superintendent of the Adult Diagnostic & Treatment Center ("ADTC"), which oversees the STU where Plaintiff is committed, placed an administrative hold on Plaintiff and referred him to commitment. (Suppl. Compl., ¶¶ 5.6, ECF No. 19-4). Plaintiff alleges that he was denied the right to be present or represented at the hearing regarding his temporary commitment order. *Id.* at ¶ 5.8. Plaintiff alleges that during his civil commitment interview with Carlson, Carlson stated that Plaintiff's civil commitment was unfair and that treatment had diminished Plaintiff's risk to re-offend; however, Carlson still referred Plaintiff for civil commitment. *Id.* at ¶ 5.9.

Plaintiff further alleges a series of incidents and conditions of his confinement that give rise to his claims against the defendants.

Plaintiff alleges that on June 6, 2006, the Special Operations Group of the DOC placed Plaintiff in a disciplinary lock-up (to which Plaintiff refers as "map") because DOC officers

found a broken razor in Plaintiff's bed area. *Id.* at ¶ 5.17. Plaintiff alleges that he stated that he had recently been moved to the cell and that the razor did not belong to him. *Id.* at ¶ 5.18. Plaintiff further alleges that the inmate who had the bed before Plaintiff was found to have an exact match to the broken razor in his possession. *Id.* Plaintiff alleges, however, that facilitators of the map group informed him that he was placed in map just to remove him from the Annex facility. *Id.* at ¶ 5.19. Plaintiff alleges that he remained on "map" status for sixty (60) days despite repeated requests by the map facilitators to reinstate Plaintiff's status. *Id.* at ¶ 5.20.

Plaintiff alleges that, on February 1, 2007, Defendant Merrill Main, Clinical Program Director for the STU, openly admitted that Plaintiff and others would never get out of the STU. *Id.* at ¶ 5.23. Plaintiff alleges, that in other meetings, Merrill Main stated that he was deliberately giving separate and better treatment to the resident population of the STU Annex facility. *Id.* at ¶ 5.24. Plaintiff further alleges that Merrill Main told Plaintiff that Plaintiff would never get out of the STU because Plaintiff had contacted the press to ask if someone could investigate the abuses occurring at the STU. *Id.* at ¶ 5.26. Plaintiff alleges that Lagana was present during this incident, and promised Plaintiff he would file a complaint against Merrill Main; however Lagana never did. *Id.* at ¶ 5.26. On another occasion, Plaintiff alleges, Merrill Main threatened Plaintiff by stating "be careful of what you wish for." *Id.* at ¶ 5.27. Plaintiff thereafter informed his public advocate about the situation at the STU, and the public advocate met with Plaintiff's treatment providers at the STU. *Id.* at ¶ 5.27. Since then, Plaintiff alleges he has been subjected to unfair and biased treatment. *Id.* at ¶ 5.27.

By way of example, Plaintiff alleges that in February 2007, Defendant Silletti-Spagnuolo, Unit Director at the STU Annex, allegedly told Plaintiff that she was disappointed in him for going to the press because she did not think that there was any abuse occurring at the STU. *Id.* at

¶ 5.28.  Plaintiff claims that his request to continue court-ordered sex offender specific treatment while in "map" was denied.  (Suppl. Compl., ¶ 6.3, ECF No. 19-5).

In addition, Plaintiff alleges that, in February 2007, DHS staff deliberately provided false information about Plaintiff's progress to the Treatment Process Review Committee ("TPRC"). (Suppl. Compl., ¶ 5.33, ECF No. 19-4).  The TPRC subsequently waited a year to render its finding on Plaintiff's annual review, which prevented Plaintiff from addressing therapeutic issues.  *Id.* at ¶¶ 5.15 5.34.  Plaintiff alleges that he was denied treatment reports or a TPRC assessment meeting for more than eighteen (18) months, which denied him the right to process through the phases of treatment.  *Id.* at ¶ 5.39.

Plaintiff alleges that on or about August 21, 2009, Defendants allegedly locked down the STU facility and searched Plaintiff's personal property.  *Id.* at  ¶¶ 5.14, 5.15.  During the lock down, Plaintiff was held in a room with nineteen (19) other individuals for three (3) hours and was kept in lock down status for fifty (50) hours in a cell with no air and at a room temperature of ninety (90) degrees.  *Id.* at ¶ 5.15.  Plaintiff alleges that during the time he was in map status, he was denied vocational and educational opportunities.  *Id.* at ¶ 5.31.

Plaintiff further alleges that Defendants restrict him to minimal sexual deviancy treatment and deny him access to mental health treatment for his alleged personality disorder; that Defendants deny him adequate sex offender treatment and do not provide him pens, paper, journals, and logs for participation in classes; and that the treatment classes are graded in a subjective, arbitrary, and capricious manner, and that such inconsistent grading is used to keep him confined.  *Id.* at ¶¶ 5.42, 5.44.  Plaintiff alleges that he does not have a personal treatment plan to help him advance through the program and is labeled "argumentative" or "disruptive" when he questions or complains about class instructions.  (Suppl. Compl., ¶¶ 5.46, 5.47, ECF

No. 19-5).  Plaintiff alleges that the staff has been ordered not to assist Plaintiff with his class assignments, and he is denied substantive feedback.  *Id.* at ¶ 5.55.

Plaintiff further alleges that Whalen and Toliver force Plaintiff to participate in religious-based substance abuse treatment, despite the fact that Plaintiff requested non-religious treatment and his overall treatment is based on cognitive behavioral therapy.  *Id.* at ¶ 5.68.  Plaintiff also alleges that Roth and Norton have denied Plaintiff meaningful access to the law library.  *Id.* at ¶ 5.71.

Plaintiff alleges that, on an unspecified date, Simms wrongly accused Plaintiff of trying to access the internet even though Simms knew Plaintiff's computer was not internet capable. (Suppl. Compl., ¶ 5.21, ECF No. 19-4).  As a result, certain of Plaintiff's personal items were destroyed.  *Id.* at ¶ 5.22.

Plaintiff alleges that, on an unspecified date, he asked Corzine on live New Jersey radio why the State was allocating money to the DOC and DHS for a program that was not working, and Corzine responded that while there may be no proof that the program works, the need to protect the public (and in particular, children) outweighed the rights of offenders.  *Id.* at ¶ 5.11.

Plaintiff alleges that the DOC recently modified his visitation from twelve (12) visits per month to ten (10) visits per month.  *Id.* at ¶ 5.12.

Finally, Plaintiff alleges that Defendants call fire drills routinely as a pretext to remove residents from their cells so that they may perform surprise cell searches.  *Id.* at ¶ 5.16.

**b.     Additional allegations in Plaintiff's Supplemental Complaint**

In connection with his additional claim for violation of equal protection, Plaintiff alleges that certain SVPs are able to advance through the TPRC program and gain release without being

obligated to do anything, demonstrating unequal application of policies. (Suppl. Compl., ¶¶ 5.84, 5.85, ECF No. 19-5).

In connection with his new claim for retaliation, Plaintiff alleges a series of events and conduct by the defendants since he filed his original Complaint.  Specifically, Plaintiff alleges that he has been retaliated against for exercising his right to free speech and for filing his lawsuit. *Id.* at ¶ 5.90.  He additionally alleges that he has been retaliated against for his wife's comments regarding the conditions and behaviors of the staff at the STU, which have been published in the New Jersey Star Ledger several times from February 2010 to August 2010. *Id.*

As further examples of retaliation, Plaintiff alleges the following.  He was placed in special management unit without notice of any reason regarding the conditions and behaviors of the staff at the STU.  *Id.* at ¶ 5.92.  The Defendants used cell searches and threats to force Plaintiff to send out all of his legal documents relating to this lawsuit and his pending Petition for Writ of Habeas Corpus.  *Id.* at ¶ 5.97.  On May 12, 2010, Plaintiff was moved to the administrative segregation building at East Jersey State prison, which houses one hundred and fifty (150) SVPs. *Id.* at ¶ 5.101. Plaintiff was subsequently placed on a segregated wing without notice or explanation. *Id.* at ¶ 5.102.  On May 21, 2010, Conway stated that DHS made the decision to place Plaintiff and the other SVPs on the segregated wing.  *Id.* at ¶ 5.104.  On May 24, 2010, Plaintiff submitted three grievance forms for administrative intervention to obtain an explanation, among other things, why he was labeled a problem resident, why he was denied treatment, and why his custody status had been modified; however, as of the date of the Supplemental Complaint, Plaintiff had received no response. *Id.* at ¶¶ 5.106, 5.107.  Plaintiff thereafter submitted another grievance after his treatment providers stated that they did not agree

8

that Plaintiff should be segregated; however, Plaintiff has received no response. *Id.* at ¶¶ 5.117, 5.118.

On June 10, 2010, Plaintiff asked Johnson and Conway if they were aware that DHS was in violation of several of its own policies. *Id.* at ¶ 5.119. In response, Johnson and Conway asked Plaintiff if DHS had responded to his grievances, and Plaintiff informed them that it had not. *Id.* at ¶ 5.120. Although Johnson and Conway both indicated that it was DHS's decision to place Plaintiff in the south unit, Plaintiff alleges that they had a duty to intervene since DHS was violating its own policies; however they didn't. *Id.* at ¶¶ 5.121-5.125

On June 22, 2010, Merrill Main, while in the south unit, stated "you guys are the undesirable of the institution" and "you guys are the alpha male with a whole lot of power and influence over the SVPs and I don't want you spewing your negativity on to the other residents." *Id.* at ¶¶ 5.126, 5.127.

On June 24, 2010, Johnson, while on the south unit, spoke with Plaintiff and several other SVPs and asked them if there were any issues to be addressed. *Id.* at ¶ 5.128. Johnson informed them that it was not his decision to place Plaintiff and the others in the segregated wing, but that DHS made the decision. *Id.* at ¶ 5.131.

On July 6, 2010, Plaintiff was woken up by officers who banged on his door and yelled "get up! get up!" The officers informed directed Plaintiff to pack all of his property because he was being placed in temporary close custody status. *Id.* at ¶ 5.132. Plaintiff was subsequently informed by a special investigator that he was being placed in temporary close custody status because there was a belief that Plaintiff and other inmates were planning to take over the institution. *Id.* at 5.133. Although Plaintiff denied the accusation, he was held in lock up for

several days without any explanation for the application of Plaintiff's modified status.   *Id.* at ¶ 5.135.

On July 13, 2010, Merrill Main stated at a community meeting that SVPs housed in the unit are "hard to control around others." *Id.* at ¶ 5.136.

On July 22, 2010, Plaintiff appeared before the Treatment Process Review Committee which told him that they found it hard to believe that Plaintiff hadn't been in Court in four (4) years. *Id.* at ¶¶ 5.137, 5.138.

On July 23, 2010, Friedman told Plaintiff that Friedman was responsible for Plaintiff's current placement on the south unit and explained that his decision was based on his belief that Plaintiff was responsible for a boycott by the SVPs and that Plaintiff was placed in map because a broken razor was found in Plaintiff's cell. *Id.* at ¶¶ 5.142, 5.143.  However, both incidents occurred over four years prior. *Id.* at ¶ 5.144.

On September 16, 2010, Plaintiff attended a community meeting during which Friedman stated that the environment in which Plaintiff and others are placed is non-therapeutic; however, Friedman stated there was nothing he could do to make it therapeutic. *Id.* at ¶ 5.148.

## II.   **STANDARD OF REVIEW**

In deciding a motion under Rule 12(b)(6), the district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  However, recently, the Supreme Court has refined the standard for

10

dismissal of a complaint that fails to state a claim in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a

complaint must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2).[1]  Citing its recent opinion in *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" *Iqbal*,

129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555), the Supreme Court identified two

working principles underlying the failure to state a claim standard.

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice .... Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not "show[n]"-- "that the pleader is entitled to relief." *Fed. Rule Civ. Proc.* 8(a)(2).

*Iqbal*, 129 S. Ct. at 1949-1950 (citations omitted).  The Court further explained that:

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausible give rise to an entitlement to relief.

*Id.* at 1950.

Thus, to prevent a summary dismissal, a civil complaint must allege "sufficient factual

matter" to show that the claim is facially plausible. *Id.* at 1949.  This then "allows the court to

---

[1] Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct.  No technical form is required." Fed. R. Civ. P. 8(d).

11

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible. *See id.* at 1949-50; *see also Twombly,* 505 U.S. at 555, & n. 3; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

Consequently, the Third Circuit observed that *Iqbal* provides the "final nail-in-the-coffin" for the "no set of facts" standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957),[2] that applied to federal complaints before *Twombly. See Fowler,* 578 F.3d at 210. Now, after *Iqbal,* the Third Circuit requires that a district court must conduct the two-part analysis set forth in *Iqbal* when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*Iqbal,* 129 S. Ct. at 1949-50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [*Id.*] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See* [*Phillips v. County of Allegheny,* 515 F.3d 224, 234-35 (3d Cir. 2008)]. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief.'" *Iqbal,* [129 S. Ct. at 1949-50]. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Fowler,* 578 F.3d at 210-11.

## III.   ANALYSIS

Plaintiff claims that Defendants violated his constitutional rights, which are protected by 42 U.S.C. § 1983. Specifically, § 1983 provides that:

---

[2] In *Conley,* as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the person injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

Therefore, to survive Defendants' motions to dismiss, Plaintiff must demonstrate, through facts that rise above the speculative level, that Defendants violated rights "secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). Here, Plaintiff alleges three new causes of action: retaliation in violation of his First Amendment rights; violation of his due process rights under the Fifth, Sixth, and Fourteenth Amendments; and deliberate indifference to Plaintiff's humane needs in violation of the Eighth and Fourteenth Amendments.

**1.     Plaintiff's claims for § 1983 money damages against the DOC and DHS Defendants in their official capacities should be dismissed**

Plaintiff's Supplemental Complaint asserts that he is suing all of the defendants in their individual and official capacities. (Supp. Compl., ¶¶ 4.29-4.31, ECF No. 19-4).[3]   In Plaintiff's request for relief, Plaintiff seeks certain monetary damages "for everyday [sic] that the Plaintiff has been held under the confinement of a sexual violent predator." *Id.* at VII.D and E.

---

[3] It appears that Plaintiff is only suing defendants Ex-Governor Corzine and Former Attorney General Milgram in their official capacities.  Additionally, as the DHS Defendants note, it does not appear that either Ex-Governor Corzine or Former Attorney General Milgram were served.  Notwithstanding, Plaintiff makes no factual allegations suggesting that either Ex-Governor Corzine or Former Attorney General Ann Milgram had any personal involvement in any of the conduct complained of.   Accordingly, all claims against Ex-Governor Corzine Former Attorney General Ann Milgram should be dismissed with prejudice.

However, a State or its officials acting in their official capacities are <u>not</u> persons under the meaning of § 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 71 (1989) (emphasis added).   While § 1983 provides litigants a federal forum to remedy many civil liberty deprivations, "it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."   491 U.S. at 66.   Moreover, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."   491 U.S. at 71.   Therefore, a suit against a state official in his or her official capacity is not a suit against a "person" under the meaning of § 1983 because it is no different than a suit against the State itself. *Id.* at 71.

Here, Plaintiff's § 1983 claims against Defendants in their official capacities fail because Plaintiff has not met the statutory threshold requirement of demonstrating that Defendants, acting in their official capacities, are "persons" within the meaning of § 1983.

Plaintiff's claims for § 1983 money damages against Defendants in their official capacities also fail under the Eleventh Amendment.   The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.   It is well established that the Eleventh Amendment immunizes states and state agencies from federal suits by private parties. *See, e.g., Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996) ("[E]ach State is a sovereign entity in our federal system; and … 'it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent . . . .") (internal citation omitted).   "That a State may not be sued without its consent is a fundamental rule of jurisprudence . . . [and] it has become established by repeated decisions . . . [that] the Constitution does not embrace authority to entertain a suit brought by private parties

14

against a State without consent." *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (quoting *Ex parte New York*, 256 U.S. 490, 497 (1921)).

Eleventh Amendment immunity "extends to suits against departments or agencies of the state having no existence apart from the state." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981), *cert. denied*, 469 U.S. 886 (1984). "Suits against state officials in their official capacity ... should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In other words, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is not different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). This includes suits against the New Jersey Attorney General. *See State Troopers Non-Commissioned Officers Assoc. of N.J. v. New Jersey*, 643 F. Supp. 2d 615, 624 (2009). However, "[a]lthough an individual may not sue the state for monetary damages ... a plaintiff may challenge the constitutionality of a state law by suing a state official acting in his official capacity for injunctive relief." *Alston v. Parker*, No. 95-6158, 2007 WL 1349303, at *7 (D.N.J. May 2, 2007) (*citing Ex parte Young*, 209 U.S. 123, 159-60 (1908); *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14 (1985) (stating that "official-capacity actions for prospective relief are not treated as actions against the State"); *Koslow v. Pennsylvania*, 302 F.3d 161, 168 (3d Cir. 2002) (stating that purely prospective relief against state officials for ongoing violations of federal law is available under the "legal fiction" of *Ex parte Young*)).

It is readily apparent that the New Jersey Department of Corrections is a department or agency of the State of New Jersey which has no existence apart from the State. *Snyder v. Baumecker*, 708 F. Supp. 1451, 1456 (D.N.J. 1989) ("Based upon the functions and characteristics of the Corrections Department, the court concludes that it is the alter ego of the

State of New Jersey and, as such, is immune from suit under the eleventh amendment."). Similarly, the Department of Human Services and the Division of Mental Health Services are agencies of the State of New Jersey having no existence separate from the State. *See Salerno v. Corzine*, No. 06-3547, 2006 WL 3780587, at *3 (D.N.J. Dec. 20, 2006). The Special Treatment Unit is a State facility run by the Department of Corrections. *See* N.J.S.A. 30:4-27.34. As state officials, when acting in their official capacities, Defendants receive the same protection from suit as provided to their governmental entity. Therefore, Plaintiff's § 1983 money damages claims against them, in their official capacities, cannot stand.

For these reasons, the Court respectfully recommends that the District Court dismiss Plaintiff's claims for § 1983 damages against Defendants in their official capacities.

> **2.  Plaintiff's remaining claims against the DOC Defendants and DHS Defendants Velez, John Main, Barone, Adams and Ottino also should be dismissed because they are based on respondeat superior liability**

Personal involvement by a defendant is an indispensable element of a valid legal claim; such personal involvement may exist only where the named defendant violated the plaintiff's rights either by executing the acts at issue himself or herself, or by directing others to violate the plaintiff's rights. *See Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Conversely, where no personal involvement by the defendant is asserted, the plaintiff's claim against that defendant is subject to dismissal. *Rode*, 845 F.2d at 1207. Thus, it is well established that supervisory liability cannot be imposed under § 1983 on a respondent superior theory. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976). " 'A defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondent superior.' " *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting

16

*Rode*, 845 F.2d at 1207). Personal involvement can be shown through allegations that a defendant directed a deprivation of a plaintiff's constitutional rights, *see id.; Monell*, 436 U.S. at 694-95 (1978), or if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *See Monell*, 436 U.S. at 694; *Sample v. Diecks*, 885 F.2d 1099, 1117-18 (3d Cir. 1989); *see also Heggenmiller v. Edna Mahan Corr. Inst. for Women*, 128 Fed. App'x 240 (3d Cir. 2005); *City of Canton v. Harris*, 489 U.S. 378 (1989). The plaintiff must allege "with appropriate particularity" that the supervisor either personally directed the unlawful conduct or had knowledge of and acquiesced in the unlawful conduct. *Rode*, 845 F.2d at 1207.

Plaintiff's Supplemental Complaint names the DOC Defendants Hayman and Goodwin and DHS Defendants Velez, John Main, Barone, Adams and Ottino in their supervisory capacities, and alleges nothing more. The Supplemental Complaint also names DOC Defendants Rogers, Lagana, and Sweeny in their supervisory capacities, and adds only limited allegations that fail to set forth that any of them either personally directed unlawful conduct at Plaintiff or had knowledge and acquiesced in the unlawful conduct of others.

Plaintiff alleges that Rogers "has directly participating [sic] in the denial of many constitutional rights of the Plaintiff through direct encounters" and that Rogers placed an administrative hold on Plaintiff and referred Plaintiff for commitment without proper legal basis. (Supp. Compl., ¶¶ 4.7, 5.6, 5.7, ECF No. 19-4). However, Plaintiff fails to set forth any facts regarding any of the alleged "direct encounters" between Rogers and/or Sweeny and also fails to allege any facts to demonstrate how and/or why Rogers's decision to place an administrative hold on Plaintiff "was not based on the law." *Id.* at ¶ 5.6. These type of conclusory allegations,

17

unsupported by additional factual allegations, are insufficient to state a cause of action. *See Iqbal,*
129 S.Ct. at 1949-1950 ("Threadbare recitals of the elements of a cause of action, supported by
mere conclusory statements, do not suffice.").

Plaintiff alleges that Sweeny "through direct encounters with Plaintiff, is responsible for
the violations of many constitutional rights of Plaintiff." (Supp. Compl., ¶ 4.9, ECF No. 19-4),
but again, fails to set forth any facts regarding these "direct encounters" between Rogers and
Sweeny. Finally, Plaintiff alleges that Lagana also "through direct encounters with Plaintiff, is
responsible for the violations of many constitutional rights of Plaintiff." *Id.* at ¶ 4.8. However,
Plaintiff fails to allege any specific encounters with Lagana other than the allegation that Lagana
was present when Main told Plaintiff he would never get out of the STU because Plaintiff went to
the press and that Lagana, at Plaintiff's request, allegedly said that he would file a complaint
against Main, but did not do so. *Id.* at ¶ 5.26.

Accordingly, because Plaintiff fails to set forth any facts that any of the DOC Defendants
and/or DHS Defendants Velez and John Main personally directed any unlawful conduct at
Plaintiff or had knowledge of and acquiesced in any unlawful conduct, the Court respectfully
recommends that the District Court dismiss Plaintiff's claims against them.

   3.   **Plaintiff's remaining claims against Whalen, Toliver, and Paolillo also should
        be dismissed under *Iqbal***

The only allegations specifically pled against Whalen and Toliver are (1) that "through
direct encounters with Plaintiff, [they are] responsible for the violations of many constitutional
rights of the Plaintiff" and (2) that they "force the Plaintiff to participate in religiously based
substance treatment . . . ." *Id.* at ¶¶ 4.21, 4.22, 5.68. However, Plaintiff fails to provide any facts
to explain and/or describe the nature of these direct encounters, how Plaintiff is forced to

18

participate in the religiously based substance treatment, or what the treatment even is. Furthermore, the only allegation specifically pled against Paolillo is that she, "through direct encounters with Plaintiff, is responsible for the violations of many constitutional rights of the Plaintiff." *Id.* at ¶ 4.18. These bare allegations against Whalen, Toliver and Paolillo, which are without any supporting facts, are insufficient to state a claim against them. *See Iqbal*, 129 S.Ct. at 1949-1950. Accordingly, Plaintiff's claims against Whalen, Toliver and Paolillo should be dismissed.

4.    **Plaintiff's remaining claims against Simms also should be dismissed because they are barred by the statute of limitations**

Plaintiff's Supplemental Complaint contains only two specific allegations against Simms: (1) that Simms "through direct encounters with Plaintiff, is responsible for the violations of many constitutional rights of the Plaintiff" and (2) sometime prior to February 2007, Simms "maliciously and deliberately" accused Plaintiff of attempting to access the internet with knowledge that Plaintiff did not have a computer that was internet capable. (Supp. Compl., ¶¶ 4.23, 5.21, ECF No. 19-4).    As explained by the DHA Defendants in their opposition brief, although Plaintiff does not specifically identify a date in which Simms allegedly falsely accused Plaintiff of attempting to access the internet, based on the chronology of the events alleged by Plaintiff, it appears that the event occurred on or before February 2007. (DHS Def. Br. 19, ECF No. 16-1).    In fact, Plaintiff does not argue to the contrary in his brief in opposition to the defendants' motions to dismiss. (Pl. Opp. Br. 29, ECF No. 31).    As explained by the District Court in its May 6, 2010 Opinion, the statute of limitations to be applied for a § 1983 action in the New Jersey District Court is two years.[4]    Accordingly, because the facts giving rise to the claims

---

[4] *See* 5/6/10 Op. 18-21, ECF No. 3.

against Simms occurred more than two years before Plaintiff filed his original Complaint, the claims against Simms should be dismissed with prejudice.[5]

### 5. Plaintiff's Second Cause of Action for abuse of authority and Ninth Cause of Action for violation of due process also should be dismissed because Plaintiff has failed to allege that he had a protected liberty interest

In order to claim a violation of due process, a prisoner is required to show that he has suffered a violation of a protected liberty interest. A liberty interest in avoiding prison disciplinary sanctions can arise either under the Due Process Clause or from mandatory language in state law or regulation. *Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir. 2002); *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). A liberty interest arising from the Due Process Clause will be implicated only if "the restraints at issue exceed the prisoner's sentence 'in such an unexpected manner as to give rise to protection by the Due Process Clause of [their] own force . . . .'" *Torres*, 292 at 150 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). A liberty interest arising from a state law or regulation will be implicated only if the "alleged deprivation 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* at 151.

Plaintiff alleges that his due process rights[6] were violated by his "unprovoked segregation" by Merrill Main and Friedman on May 12, 2010. Plaintiff further alleges that after being placed in segregation, he submitted three grievance forms stating, among other things, that he had not been provided with an explanation for his change in custody status as required pursuant to a relevant New Jersey Administrative Code. (Suppl. Compl., ¶ 5.106, ECF No. 19-5). Unless a prisoner's deprivation of liberty was in some way extreme, the Constitution does not

---

[5] Additionally, the allegations do not sufficiently state a claim under *Iqbal*. *See Iqbal*, 129 S. Ct. at 1949-1950.

[6] Although Plaintiff does not specify, it appears that Plaintiff is alleging a violation of both procedural and substantive due process.

20

require that the prisoner be afforded "*any process at all* prior to deprivations beyond that incident to normal prison life." *Deavers v. Santiago*, 243 Fed. App'x. 719, 721 (3d Cir. 2007) (interpreting *Sandin*, 515 U.S. at 484 as holding that a prisoner had no cognizable liberty interest in being free from segregated confinement because it did not present atypical and significant hardship on the prisoner). The Third Circuit has extended *Sandin* to civilly committed individuals. *Id.; see Leamer v. Fauver*, 288 F.3d 532 (3d Cir. 2002).

Here, Plaintiff has failed to allege any facts to show that his placement in segregation imposes upon him an atypical and significant hardship beyond the incident of ordinary civil commitment. Moreover, as detailed below, although Plaintiff alleges that Merrill Main and Friedman segregated him without provocation and failed to provide him notice as required under the New Jersey Administrative Code, he concedes in his Supplemental Complaint that he was informed of reasons why he was segregated. Accordingly, Plaintiff's segregation did not implicate any protected liberty interest.

Finally, even if Plaintiff had a protected liberty interest, the Defendants' actions did not violate his due process rights. The Due Process Clause of the Fourteenth Amendment requires that civilly committed persons, such as SVPs, should not be subjected to conditions amounting to punishment, but that such conditions are constitutionally adequate so long as they fall within the bounds of professional judgment. *See Bell v. Wolfish*, 441 U.S. 520 (1979); *Youngberg v. Romeo*, 457 U.S. 307 (1982). Thus, "whether [an institutionalized individual's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Youngberg* at 321. In determining what is reasonable, the Court must defer to a qualified professional's judgment and must not be concerned with *de minimis* restrictions on an SVP's liberty. *Id.* Moreover, the federal judiciary should refrain from interfering with internal

21

operations of state institutions whenever possible because there is no reason to think that judges or juries (that is, non-professionals) are better qualified than facility administrators (that is, professionals) in making operational decisions. *Youngberg* at 322–23. Therefore, the decisions made by such professionals are presumptively valid and liability for due process violations "may be imposed only when the decision by a professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg* at 323. Further, an institution's failure to follow its written policies creates no actionable right in a resident. *Sandin v. Conner*, 515 U.S. 472, 482 (1995).

Here, although Plaintiff alleges that his placement was unprovoked, he alleges that Merrill Main stated that the individuals placed in segregation were "the alpha male with a whole lot of power and influence over the other SVPs and I don't want you spewing your negativity on to the other residents" and were "hard to control around others." (Suppl. Compl., ¶¶ 5.127, 5.136, ECF No. 19-5). Finally, Plaintiff also specifically alleges that Friedman admitted that he was responsible for placing Plaintiff in the segregated housing unit because Friedman believed that Plaintiff organized an SVP boycott and because of Plaintiff's prior "map" placement in 2006. Accordingly, based on Plaintiff's own allegations, it appears that his placement in segregation was not unprovoked, but rather was due to specific reasons, and therefore did not violate his due process rights, whether his liberty interest arose from the Due Process Clause or New Jersey state law.

Accordingly, the decision to place Plaintiff in the segregated wing of the segregated building was not such a "substantial departure" from accepted professional judgment as to warrant judicial interference. In *Sandin v. Conner*, 515 U.S. at 482 (1995), a state prisoner made

22

a similar claim to Plaintiff; that is, being placed in disciplinary segregation violated his liberty interest entitled to due process protection. *Id.* at 476–77. The Court held that "transfer to a maximum security facility, albeit one with more burdensome conditions," fell *within* the professional discretion of prison administrators and did *not* constitute a substantial departure from professional standards that would implicate Plaintiff's liberty interests. *Id.* at 478. Though the STU is not a prison and Plaintiff is a civilly committed SVP, as opposed to a prisoner, that same highly deferential standard to the decision-making authority of professional facility administrators applies. *Deavers v. Santiago*, 243 Fed. App'x. 719 (3d Cir. 2007) (citing *Sandin v. Conner*, 515 U.S. 472 (1995)). Given Plaintiff's prior "map" placement regarding the broken razor incident, his alleged involvement in organizing an inmate boycott, and Merrill Main and Friedman's institutional desire to separate potential trouble makers from compliant SVPs, their decision to place Plaintiff in a segregated unit serves relevant state interests of maintaining order and discipline in the STU without unduly violating Plaintiff's liberty interests. Therefore, the placement of Plaintiff by Merrill Main and Friedman in the segregated unit would fall within the ambit of their professional judgment, precluding judicial interference.

For these foregoing reasons, Plaintiff's due process claim should be dismissed.

### 6.   Plaintiff's Third Cause of Action for failure to provide educational and vocational opportunities also should be dismissed under *Iqbal*

In support of his claim, Plaintiff alleges generally that "Plaintiff continues to be denied vocational and educational opportunities on a daily basis."[7] Plaintiff further alleges that the denial of these opportunities "demonstrate the failure to provide Plaintiff with the best available and unbiased treatment." (Suppl. Compl., ¶¶ 5.30, 6.3, ECF Nos. 19-4 and 19-5). Other than these

---

[7] Plaintiff's claim that he was denied "schooling" while he was in the "caged area" in June 2006 is also barred by the statute of limitations because the alleged conduct occurred more than two years before Plaintiff filed his Complaint.

conclusory allegations, Plaintiff provides no additional facts to show what educational and/or vocational opportunities were denied, why they were denied, or to what extent. Accordingly, because Plaintiff provides no facts to support his conclusory allegations, his claim should be dismissed. *See Iqbal,* 129 S. Ct. at 1949-1950.

7. **Plaintiff's Sixth Cause of Action for failure to provide access to the Courts against Roth and Norton and claim for continued confinement against Carlson were already dismissed**

Plaintiff makes no allegations in the Supplemental Complaint against Roth and Norton other than those alleged in his original Complaint that were related to his claim for failure to provide access to the Courts, which was previously dismissed without prejudice by the Court. (5/6/10 Op. 18-21, ECF No. 3). Additionally, Plaintiff makes no allegations in the Supplemental Complaint against Carlson other than those alleged in his original Complaint that were related to his claim for continued confinement, which also was previously dismissed with prejudice by the Court. *Id.* Accordingly, Plaintiff's claims against Roth, Norton and Carlson in his Supplemental Complaint, if any, should be dismissed.

8. **Plaintiff's Seventh Cause of Action for violation of equal protection against the DOC and DHS Defendants also should be dismissed because Plaintiff has failed to plead a cause of action**

Plaintiff alleges that his right to equal protection has been violated because (1) Merrill Main stated that the resident population of the STU annex facility was given separate and better treatment, (2) DHS placed "several inmates in phase 4 status of treatment and circumvented the T.P.R.C process" (Suppl. Compl., ¶ 5.74, ECF No. 19-5); and (3) Plaintiff was placed in segregation on May 12, 2010.

The Equal Protection "provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons

similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *see also Artway v. Attorney Gen.,* 81 F.3d 1235, 1267 (3d Cir. 1996). Plaintiff alleges that he has been treated differently than similarly situated SVPs. As such, to state a cause of action for violation of equal protection, Plaintiff must allege facts to make plausible the existence of these "similarly situated SVPs." *See Iqbal,* 129 S.Ct. at 1949.

However, Plaintiff has failed to do so. Although Plaintiff alleges that Merrill Main stated that the resident population of the STU's annex were receiving better treatment, Plaintiff fails to allege any facts to show that the inmates in segregation are similarly situated to the resident population inmates. Furthermore, although Plaintiff alleges that the DHS placed "several inmates" in phase 4 of treatment, he not only fails to allege any facts that these inmates were similarly situated to others who were not placed in the same phase of treatment, but also fails to even identify who these inmates were.

Finally, although Plaintiff alleges that the actions of Merrill Main, Friedman, Silletti-Spagnuolo and Adams by which they placed Plaintiff in administrative segregation on May 12, 2010 "without applying the same policies and practices to other similarly situated SVPs", which violated his right to equal protection (Suppl. Compl., ¶ 6.8, ECF No. 19-5), Plaintiff provides no facts to support this conclusory allegation that he was treated differently than "similarly situated SVPs," and, again, provides no facts to demonstrate that he was similarly situated to any of the other SVPs. Because Plaintiff fails to provide specific factual allegations as to what/who these similarly situated parties are, Plaintiff's Supplemental Complaint fails to make plausible that these parties actually exist and that they are like him in all relevant aspects.

Accordingly, Plaintiff's claim fails to state a cause of action for violation of equal protection and that claim should be dismissed. *See Iqbal,* 129 S. Ct. at 1949-1950.

25

9.   **Plaintiff's Eighth Cause of Action for retaliation against Merrill Main, Silletti-Spagnuolo, Simms, and Friedman also should be dismissed because Plaintiff has not pled sufficient facts to support that claim**

To state a cause of action for First Amendment retaliation, Plaintiff must allege facts showing that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (citing *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in a challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 334. "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution . . . ." *White v. Napoleon*, 897 F.2d 103, 111–12 (3d Cir. 1990).

Defendants acknowledge that Plaintiff has a First Amendment right to complain to the press about the conditions at the STU, regardless of his SVP status. Indeed, a prisoner's (or in his case, a committee's) ability to file grievances and lawsuits against prison (or facility) officials is a constitutionally-protected activity for purposes of a retaliation claim. *See Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir. 1981) (retaliation for exercising the right to petition for redress of grievances states a cause of action for damages under the Constitution). Defendants, however, argue that Plaintiff has failed to allege that he suffered any adverse action by any of the defendants.

26

Plaintiff asserts that Defendants Merrill Main, Friedman, Silletti-Spagnuolo and Adams retaliated by:

- reducing the monthly visit program from twelve (12) visit periods to to ten (10);

- violating Plaintiff's privacy and dignity and destroying his property after falsely accusing him of attempting to access the internet;

- waiting a year to render a finding regarding Plaintiff's allegation that the DHS staff deliberately provided false information to the TPRC;

- harshly evaluating Plaintiff's behavior and capriciously labeling him as disruptive because he voiced concerns and/or asked questions pertaining to class content;

- moving Plaintiff to administrative segregation on May 12, 2010 without valid reason; and

- locking down Plaintiff on July 6, 2010 without valid reason.

(Suppl. Compl., ¶¶ 5.12, 5.21, 5.22, 5.34, 5.47, 6.9, 6.10, ECF Nos. 19-4 and 19-5).  The named defendants allegedly did these things because:

- Plaintiff called Former Governor Corzine while Former Governor Corzine was on live radio and complained about the SVP program;

- Plaintiff filed his Complaint on May 12, 2010;

- Plaintiff's wife exposed in the press the defendants to criticism; and

- Plaintiff's attorney exposed in the press Barone for sexual misconduct.

*Id.* at ¶¶ 5.11, 5.90, 6.9. 6.10.

First, all of the acts Plaintiff alleges are retaliatory are not retaliation because (i) as discussed in prior sections, Plaintiff's placement in segregation and lock downs are not matters that call for this Court's intervention in this case; (ii) several of the acts apply to the entire

27

resident population, or in some instances, to a portion of the population (i.e. reduction of visitations and placement in segregation); (iii) the acts are explained by Plaintiff himself with other legitimate reasons; and (iv) the acts are too remote (i.e. the allege conduct occurred months after the expression of First Amendment rights or occurred before such expression, or occurred at a time beyond the statute of limitations period).

Moreover, the Court finds that Plaintiff's claims do not satisfy the second or third prongs of the *Rauser* retaliation test. With respect to the second prong, Plaintiff has not specifically alleged what adverse actions that DHS defendants Jennifer Velez or John Main took against him. He merely states that they hold positions of administrative oversight, but does not allege how they were personally involved in any purported wrongs done to him. Similarly, Plaintiff claims that Hayman, Rogers, Lagana, Sweeney, and Goodwin, through their supervisory roles and participation in oversight committees, developed or applied policies and procedures that violated his constitutional rights; however, Plaintiff fails to allege how each specifically took adverse actions against him. Plaintiff also alleges that Silletti-Spagnuolo expressed disappointment regarding his comments to the press and disagreed with his assessment that abuse occurred at STU. However, these allegations do not demonstrate that DHS Defendant Silletti-Spagnuolo took any adverse action against him or violated his constitutional rights in any way. Further, Plaintiff alleges that the "'DHS Staff deliberately provided false information about the plaintiff to the Treatment Progress Review Committee." *Id.* at ¶ 5.33. However, Plaintiff does not state what Defendants, if any, were part of the "DHS Staff," what allegedly false information about Plaintiff was communicated by said staff to the TPRC, or what Defendants, if any, denied his requests for treatment reports or a TPRC assessment meeting for more than eighteen (18) months. Plaintiff alleges that Friedman told Plaintiff to take his complaints to court, but Plaintiff does not allege

any conduct by Friedman that could be construed as retaliation or any nexus between Friedman's statements and Plaintiff's protected conduct.

With respect to the third prong of the *Rauser* retaliation test, Plaintiff does specifically allege that Merrill Main openly admitted that Plaintiff and the other residents would probably not get out of STU and that he gave better treatment to the resident population of the STU Annex. Although these allegations may be specific, they do not support a retaliation claim because Plaintiff has not pled sufficient facts to demonstrate that Merrill Main's purported adverse action was substantially motivated as a result of Plaintiff or his wife speaking to the press regarding conditions for STU residents.

Plaintiff also alleges that Lagana never filed a complaint on Plaintiff's behalf, as he promised to do, after witnessing Merrill Main tell Plaintiff he was not getting out of STU because he spoke to the press. However, Plaintiff also fails to allege how Lagana's purported retaliation -- Lagana's failure to file a complaint -- was substantially motivated by Plaintiff's or his wife's statements to the press.

Plaintiff's specific allegations against Simms -- that she falsely accused him of trying to access the internet when she knew that his computer was not internet accessible -- not only fails to implicate Plaintiff's constitutional rights, but Simms's alleged misconduct occurred *before* Plaintiff went to the press. Thus, Simms could not have been substantially motivated by Plaintiff speaking to the press when she falsely accused him of trying to access the internet. This allegation simply does not rise to a level requiring Lagana to defend himself in Federal Court.

Moreover, Plaintiff's claim that the Defendants retaliated against him by segregating him on May 12, 2010 for filing his civil rights suit is factually insupportable because Plaintiff fails to provide any evidence that defendants knew that Plaintiff would file a civil rights complaint until

29

they were served on August 13, 2010 - three months *after* plaintiff alleges the Defendants retaliated against him.

Plaintiff responds that Defendants *may have* known about the complaint before being served on August 13, 2010 and September 3, 2010 because Plaintiff had to fill out a form stating why he was using the law library while he was preparing it and that some Defendants could have read his complaint when they were asked to make copies of it. This type of speculative allegation is insufficient to support a retaliation claim. *See Iqbal*, 129 S. Ct. at 1949-50.

Finally, Plaintiff's claim that he was locked down in July 6, 2010 because his attorney spoke to the press regarding Barone's sexual misconduct is contradicted by Plaintiff's own allegation that Plaintiff was told he was being locked down because there was information that he and other inmates were planning to take over the unit. *See* Suppl. Compl., ¶ 5.133, ECF No. 19-5.

Therefore, because Plaintiff has not specifically alleged how the individual Defendants took adverse action – if any - against Plaintiff, and because Plaintiff cannot support a claim pursuant to § 1983 on the basis of vicarious liability or respondeat superior, Plaintiff has failed to satisfy the second prong of the *Rauser* retaliation test.[8] Additionally, because Plaintiff has failed to adequately allege any nexus between the individual Defendants' actions and Plaintiff's, his wife's and/or his attorney's protected conduct, Plaintiff has also failed to satisfy the third prong of the *Rauser* test.

For these foregoing reasons, Plaintiff's retaliation claim against DHS and DOC Defendants, in their individual capacities, fails.

---

[8] *See Iqbal*, 129 S. Ct. at 1948–49 (supporting the proposition that a plaintiff cannot state a claim pursuant to § 1983 on the theory of vicarious liability or respondeat superior).

10. **Plaintiff's Tenth Cause of Action for Deliberate Indifference against Merrill Main and Friedman also should be dismissed because Plaintiff has failed to demonstrate a serious medical need**

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble,* 429 U.S. 97, 103-04 (1976); *Rouse v. Plantier,* 182 F.3d 192 (3d Cir. 1999). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Estelle,* 429 U .S. at 106; *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 582 (3d Cir. 2003).

To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). The Third Circuit has defined a serious medical need as: (1) "one that has been diagnosed by a physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss." *Atkinson v. Taylor,* 316 F.3d 257, 272-73 (3d Cir. 2003) (internal quotations and citations omitted); *see also Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied,* 486 U.S. 1006 (1988).

The second element of the *Estelle* test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. *See Natale,* 318 F.3d at 582 (finding deliberate indifference requires proof that the official knew of and disregarded an

31

excessive risk to inmate health or safety). "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *See Farmer v. Brennan,* 511 U.S. 825, 837-38 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. *See Andrews v. Camden Cnty.,* 95 F. Supp. 2d 217, 228 (D.N.J. 2000); *Peterson v. Davis,* 551 F.Supp. 137, 145 (D.Md. 1982), *aff'd,* 729 F.2d 1453 (4th Cir. 1984). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. *See Estelle,* 429 U.S. at 105-06; *White,* 897 F.2d at 110.

Plaintiff claims that the "refusal by Defendants Main and Friedman to provide medical services to the Plaintiff for treatment of his mental injury and/or his trauma suffered at the hands of the other defendants and the environment" and his placement in the Administrative Segregation Building, in inhumane conditions, with untrained staff constitutes deliberate indifference to the treatment needs of the Plaintiff." (Supp. Compl., ¶¶ 6.13, 6.14, ECF No. 19-5). Specifically, Plaintiff alleges that the building itself was not conducive to his therapeutic needs and exacerbated his mental injury or trauma. However, other than vague allegations that he has increased anxiety and "intense feelings of fear," Plaintiff has not alleged any facts showing that he

has any serious medical need for which he requires medical care. *See Monmouth Cnty. Corr.*, 834 F.2d at 347. Therefore, Plaintiff fails to satisfy the first prong of the deliberate indifference test.

Plaintiff also does not satisfy the second prong of the deliberate indifference test because he does not allege how Defendants Main or Friedman acted with reckless disregard of a known risk of harm to Plaintiff -- since Plaintiff has failed to articulate the scope and/or severity of the alleged medical need. Indeed, he only makes general allegations that do not particularly state how each of these individual Defendants acted with deliberate indifference to a known medical need of Plaintiff.

Accordingly, Plaintiff's claim for deliberate indifference should be dismissed.

**11.     Plaintiff should be allowed to re-plead his Fourth Cause of Action for failure to provide adequate treatment and that cause of action should be consolidated with *Alves v. Ferguson*, 01-789 (DMC).**

Plaintiff alleges that Defendants have failed to provide him with adequate treatment by limiting him to only minimal sexual deviancy treatment and denying him access to mental health treatment. The Substantive Due Process component of the Fourteenth Amendment requires that when state officials impose substantial deprivations of liberty associated with civil commitment, they must also provide access to mental health treatment that gives those committed a realistic opportunity to be cured or to improve the medical condition for which they were confined. *Youngberg*, 457 U.S. at 319-322.

Although Plaintiff provides numerous examples of the inadequate and subjective treatment provided,[9] Plaintiff generally fails to allege what specific Defendants engaged in the

---

[9] The Court acknowledges that certain examples of conduct occurred more than two years prior to the filing of the Complaint and thus could arguably not give rise to a cause of action because it would be barred by the statute of limitations. *See* Suppl. Compl., ¶5.33, ECF No. 19-4. However, Plaintiff provides numerous examples of ongoing inadequate treatment that could give rise to a valid cause of action for inadequate treatment.

33

alleged conduct. However, because it appears that Plaintiff could properly plead a cause of action if he identified the specific Defendants at issue, the Court respectfully recommends that the District Court deny the DOC and DHS Defendants' motion to dismiss this claim and permit the Plaintiff to re-plead this cause of action in accordance with the requirements set forth in *Iqbal*. In the event Plaintiff chooses to re-plead and adequately sets forth a claim for failure to provide adequate treatment, because the Court finds that this potential claim will involve common questions of law and fact with the ongoing case, *Alves v. Ferguson*, 01-789 (DMC), which itself is consolidated with several other cases, the Court respectfully recommends that the District Court consolidate the action with *Alves v. Ferguson*, 01-789 (DMC).

## V.      CONCLUSION

For the reasons stated above, the Court respectfully recommends that the District Court grant in part and deny in part Defendants' motions to dismiss.

JOSEPH A. DICKSON, U.S.M.J.